UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| TERESA D. NIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00011 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KYSELA PERE ET FILS, LTD., *et al.*, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Teresa D. Nixon's claims arise from a toxic relationship with her boss, Defendant Francis J. Kysela, V ("Kysela"), and her employment at his company, Defendant Kysela Pere Et Fils, Ltd. ("Kysela Company") (collectively, "Defendants"). Over approximately six years, Nixon alleges that what started as a consensual, romantic relationship morphed into a manipulative scheme to keep her in a sexual relationship. This alleged scheme involved Nixon's employment with Kysela Company, her home, a bank loan, and her unwitting addiction to a prescription drug.

Defendants have moved to dismiss Nixon's amended complaint under Federal Rule of Civil Procedure 12(b)(6). The motion has been fully briefed, and the court heard oral argument on May 6, 2021. For the reasons stated below, the court will grant in part and deny in part Defendants' motion to dismiss.

### I. BACKGROUND

According to her amended complaint, Nixon is a "professional marketing executive who had a thirty-year successful career with a sales and marketing company." (Am. Compl. ¶

1

1 [ECF No. 15].) Kysela Company is allegedly "one of the top specialty wine and spirit importers in the United States," and Kysela is the founder and sole owner of Kysela Company. (*Id.* ¶¶ 2–3.)

In 2013, Nixon and Kysela engaged in a consensual, romantic relationship while Kysela was married and Nixon was legally separated. Nixon alleges their relationship became "on again, off again," and that Kysela used "a variety of plans, tactics, and schemes designed to pressure, compel, and hold Ms. Nixon in their sexual relationship," as outlined in her amended complaint and recited below. (*Id.* ¶¶ 6–7.)

*Employment*. In 2014, Kysela encouraged Nixon to work for his company, and she agreed. Nixon alleges that her employment at Kysela Company became Kysela's "main vehicle to coerce her to continue her sexual relationship with him. . . . [and that] Kysela made decisions about Ms. Nixon's employment based on the status of the sexual relationship between the two." (*Id.* ¶ 9.)

In 2016, Kysela terminated Nixon's employment in May "after another 'off[-]again' cycle in their sexual relationship," but rehired her again in September. (*Id.* ¶ 10.) This pattern continued for several years. In May 2017, Kysela again terminated Nixon's employment with his company. He allegedly "drafted a separation agreement for Ms. Nixon but it was not finalized because Nixon resumed their sexual relationship." (*Id.* ¶ 12.) In September 2017, Kysela "'fired' Ms. Nixon yet again, but her employment never really ended." (*Id.* ¶ 13.) In June 2018, Kysela "downgraded" Nixon's job responsibilities. (*Id.* ¶ 14.) Nixon then alleges that Kysela came to her house on July 3, 2018, "climbed a ladder and entered through an open door while Ms. Nixon was in the shower, and [he] convinced her to have sex with

him." (*Id.*) Then, in a November 2018 email "that was part of an email string related to sex, [Kysela] said, 'If you take care of me, I take care of you . . . that's how life works . . . you deny me and we have issues.'" (*Id.* ¶ 15.) In January 2019, Nixon resigned from Kysela Company and got a new job. After her resignation, however, Kysela "convinced" Nixon to remain part time with Kysela Company, and to eventually quit her other job. On February 8, 2019, Kysela told Nixon, "I wish we had lived together and you were my assistant for life." (*Id.* ¶ 18.)

On July 31, 2019, Nixon and Kysela, on behalf of Kysela Company, entered into a three-year employment contract.[1] Nixon alleges that Kysela offered this contract "to induce [her] to stay in a sexual relationship with him and to have it as a tool to keep her in the relationship by tying her continued employment to meeting his sexual desires." (*Id.* ¶ 20.) Several days later, on August 4, 2019, Kysela agreed to Nixon's "request/statement that their relationship would be business only." (*Id.* ¶ 25.) Kysela continued to pursue sex with Nixon, however, and she sometimes "gave in." (*Id.*) In September 2019, Nixon "was seeing a counselor and trying to get out of her sexual relationship with Mr. Kysela." (*Id.* ¶ 26.) On September 29, 2019, Nixon terminated her relationship with Kysela for the final time. Nixon alleges that on the same day, Kysela, acting for Kysela Company, fired her in breach of her employment contract.

*Nixon's Home.* In November 2013—when the relationship was still new—Kysela "purchased Ms. Nixon's home and told [her] to finalize her own divorce, and then buy her home back from [him] when she was back on her feet again financially." (*Id.* ¶ 33.) Nixon

---

[1] The contract is attached to the original complaint. (ECF No. 1-2.)

3

agreed, and she and her daughter lived in the home as renters. Nixon alleges that Kysela used his ownership of her home "as another way to continue to coerce sex from Ms. Nixon." (*Id.* ¶ 35.)

In December 2016, approximately three years after Kysela purchased Nixon's home, Nixon signed a contract to purchase a townhouse. When Kysela found out, he threatened to fire her if she did not remain in the home that he owned. In April 2017, Kysela "removed Ms. Nixon from a business trip in Europe because she went forward with purchasing the [townhouse]." (*Id.* ¶ 37.)

*Bank Loan*. In November 2017, Kysela and Nixon took out a $60,000 loan with BB&T Bank, with Kysela's credit supporting the loan.[2] According to Nixon, Kysela gave her the money, and they orally agreed that she would make the loan payments to BB&T. In conjunction with their oral agreement that Nixon would pay BB&T, Kysela presented her with an employment contract "for five years or until refinancing of the debt." (*Id.* ¶ 31.) Nixon alleges that Kysela's intent was to hold her in a sexual relationship while the loan was in repayment.

*Prescription Drugs*. In February 2014, Nixon alleges that Kysela gave her Clonazepam pills, told her they were sleeping pills, and encouraged her to take them. Kysela, who acquired the Clonazepam through his own prescription, did not tell Nixon that they were addictive. Nixon eventually become dependent upon the pills.

Once, after Nixon allegedly became addicted to the Clonazepam, Kysela withheld the pills from her when she declined to go with him on a business trip, "where his intent for the

---

[2] The court does not have access to the loan document. Currently, there is just under $52,000 outstanding on the loan.

trip was to engage in sexual activity with [her]." (*Id.* ¶ 42.) Nixon alleges that when Kysela terminated her employment for the final time in September 2019, he mailed Nixon additional pills. When she finished taking that supply, he did not supply any further pills. Nixon alleges that Kysela provided her with the pills "to induce Ms. Nixon's addiction and use such dependence as an additional means of controlling her, including controlling her sexual relationship with him." (*Id.* ¶ 47.) Nixon eventually stopped taking the pills with the help of her medical provider.

Nixon filed the instant suit in February 2021, bringing six claims: (1) hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII") against Kysela Company; (2) quid pro quo discrimination under Title VII against Kysela Company; (3) breach of contract against Kysela Company; (4) gross negligence/willful and wanton conduct against Kysela and Kysela Company; (5) intentional infliction of emotional distress against Kysela and Kysela Company; and (6) a "count" for "Injunctive Relief—Declaration of Contract as Void as Against Public Policy" against Kysela.

## II. MOTION TO DISMISS STANDARD

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need

5

"detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

### III. ANALYSIS

**A.     Count I: Hostile Work Environment**

Under Title VII, employers are prohibited from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (citation omitted). A plaintiff bringing a hostile work environment claim must allege four elements: (1) that there was unwelcome conduct; (2) that the unwelcome conduct was based on her sex; (3) that the unwelcome conduct was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive atmosphere; and (4) that the conduct is imputable to the employer. *Id.* at 207–08; *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011). In assessing whether a work environment is objectively hostile, it is necessary to consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002).

Nixon argues that the relationship as a whole, and the way Kysela treated her, created

a hostile work environment. While Nixon's allegations unquestionably describe an unhealthy relationship between her and Kysela, Nixon never raises any allegations regarding her working environment, nor does she describe how the conduct negatively impacted her performance. In other words, Nixon's allegations are about whether she *had* a job or not, depending on her sexual relationship with Kysela; there are no allegations *about* her job, or what her work environment was. Nixon has therefore failed to state a plausible claim for hostile work environment. Nixon, however, may be able to cure this deficiency by pleading additional facts related to her working environment and the terms and conditions of her employment. The court will therefore grant Defendants' motion to dismiss as to Count I, but grant Nixon leave to amend her complaint.

### B.     Count II: Quid Pro Quo Sexual Harassment

Quid pro quo sexual harassment is defined as "harassment in which a supervisor demands sexual consideration in exchange for job benefits." *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983) (citation omitted). To state a claim for quid pro quo sexual harassment, a plaintiff must establish: (1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) her reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. *U.S. EEOC v. Appalachian Power Co.*, No. 1:18CV00035, 2019 WL 4644549, at *6 (W.D. Va. 2019) (citing *Okoli*, 648 F.3d at 222).

Defendants raise two arguments in support of their motion to dismiss, but neither are persuasive. First, Defendants argue that Nixon's allegations do not establish that Kysela's

7

advances were "unwanted" or "unwelcome." In other words, Defendants argue that because the relationship was consensual, there can be no viable quid pro quo claim. This argument, however, requires inferences in favor of Defendants, not Nixon. The allegations in the complaint plausibly describe a situation where Nixon may have verbally consented to sex (or "gave in") only because she was scared that she would lose her job (or she wanted her job back). Further, the complaint alleges that Nixon eventually sought counseling in order to get out of her relationship with Kysela. Taking all reasonable inferences in Nixon's favor—as the court must—Nixon alleges that she was coerced into a relationship, at various stages, that she did not want to be in. Although Nixon alleges that her relationship with Kysela started as consensual, the court cannot assume, based on these allegations, that the remainder of the relationship—and therefore every sexual encounter between Nixon and Kysela—was consensual, especially in light of the factual allegation that Nixon sought counseling to help her end it.

Second, Defendants argue that because Nixon's firing in 2019 was the result of personal animosity from the failed relationship (as opposed to sex discrimination), she fails to state a viable claim. Defendants cite numerous cases where, broadly speaking, women received negative treatment at work after romantic relationships with their bosses/coworkers ended, and courts held they did not state a sex discrimination claim under Title VII. *See, e.g.*, *Novak v. Waterfront Comm'n of N.Y. Harbor*, 928 F. Supp. 2d 723, 729–30 (S.D.N.Y. 2013) ("There is [only] evidence . . . that she was treated unfairly due to animus resulting from her decision to end her consensual relationship."); *West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 545 (E.D. Va. 2002) ("[The defendant's] alleged actions were because of his animosity

8

towards [the plaintiff] for ending the consensual relationship rather than her gender."); *Campbell v. Masten*, 955 F. Supp. 526, 529 (D. Md. 1997) ("[The plaintiff] makes no claim that that situation was based on gender, rather than personal animosity.").

In making this argument, however, Defendants solely focus on when Nixon finally ended her relationship with Kysela in September 2019 and he immediately fired her. While the case law suggests that Nixon's firing in 2019 would not, on its own, state a quid pro quo sex discrimination claim, the court need not decide that for purposes of this motion. *See West*, 205 F. Supp. 2d at 545 (holding that because the male co-worker did not sexually harass the plaintiff *after* their relationship ended, but before she was fired, the plaintiff did not state a quid pro quo discrimination claim).

Here, Nixon alleges that her job was contingent on whether or not she was having sex with Kysela over multiple years of employment with Kysela Company. Through 2016, 2017, and 2018, Nixon alleges that her employment was "on again, off again" due to the "cycle" in their sexual relationship. (*See, e.g.*, Compl. ¶ 12 (alleging that Kysela terminated Nixon in May 2017 and drafted a separation agreement, but that her termination was "not finalized because Nixon resumed their sexual relationship").) Further, in an email chain related to sex, Kysela stated, "If you take care of me, I take care of you . . . that's how life works . . . you deny me and we have issues." (*Id.* ¶ 15.) At the motion to dismiss stage, the court can readily infer that Nixon endured "harassment in which a supervisor [Kysela] demand[ed] sexual consideration in exchange for job benefits." *Katz*, 709 F.2d at 254. And conversely, the court cannot infer at this stage that any negative repercussions were solely the result of personal animosity. The court will therefore deny Defendants' motion to

dismiss as to Count II.

**C.     Count III: Breach of Contract**

Under Virginia law, the elements for a breach of contract claim are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

The employment contract between Nixon and Kysela Company had a three-year term, but it allowed Kysela Company to terminate the agreement prematurely under four conditions:

  a.   Conduct by Nixon evidencing substance or alcohol abuse or dependency, disloyalty, dishonesty, or any other conduct in contravention of the financial and business interests of Kysela; or

  b.   Nixon's failure to generate and attain minimum monthly sales of $70,000.00 per month by May 19th, 2020 which is nine (9) months from the beginning of this Agreement; or

  c.   Nixon's breach of the terms and provisions hereof; or

  d.   Kysela's dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided Kysela gives Nixon a 30-day written notice.

(ECF No. 1-2 at 6.) Nixon alleges that none of these enumerated reasons supported her termination; rather, she alleges that she was fired immediately after she finally ended her sexual relationship with Kysela in September 2019. Nixon contends that she incurred losses, including her salary of $330,000 (over three years), and the value of her employment benefits.

10

Defendants focus on the fourth subsection, arguing that Nixon's claim fails because she does *not* allege (1) that Kysela was satisfied with her job performance, or (2) that she did not receive the requisite 30-day notice. This argument is without merit. Nixon has alleged the existence of a legally enforceable employment contract; that Kysela Company breached the contract by firing her for a reason outside the enumerated reasons above—namely, that she ended her sexual relationship with Kysela; and that she incurred damages as a result of that breach. That is all Nixon needs to allege to state a plausible breach of contract claim. Defendants' argument otherwise is a red herring because it focuses on one of the enumerated "reasons" that is not at issue. The court will therefore deny Defendants' motion to dismiss as to Count III.

### D.   Count IV: Negligence

"The essential elements of a negligence claim in Virginia, as elsewhere, are (1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." *Talley v. Danek Med., Inc.*, 179 F.3d 154, 157 (4th Cir. 1999). "The Virginia Supreme Court has established that negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such person would not have done under existing circumstances." *Souleyrette v. Conaway*, 8 F. Supp. 2d 554, 558 (W.D. Va. 1998) (internal quotation marks omitted) (quoting *Moore v. Va. Transit Co.*, 50 S.E.2d 268, 271 (Va. 1948)). "Accordingly, ordinary or reasonable care is that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury to another.'" *Id.* (quoting *Perlin v. Chappell*, 96 S.E.2d 805, 808 (Va. 1957)).

Defendants first argue that Nixon has failed to allege that Kysela had a duty (and therefore breached that duty) towards Nixon. Under Virginia law, the existence of a duty does not require proving a "particular" relationship, but "arises from the basic and necessary regulation of civilization which forbids any person because of his own convenience, to recklessly, heedlessly or carelessly injure another." *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 810 (Va. 2018) (internal quotation marks omitted). "In order for the actor to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individual." *Id.* (cleaned up). The Virginia Supreme Court has noted that, in the vast majority of cases, the parties are strangers at the time of an incident. *Id.*

Defendants' argument elevates form over substance. Nixon alleges that Kysela gave her prescription pills for Clonazepam, told her they were sleeping pills, and encouraged her to take them to help her sleep. Nixon further alleges that Clonazepam is highly addictive, and that she ultimately became addicted to the pills. Although Nixon's complaint does not contain a formulaic recitation of the elements of a negligence claim—duty, breach, causation, and harm—Nixon alleges *facts* that allow the court to conclude that Kysela owed Nixon a duty and that he breached that duty.

Second, Defendants argue that the claim is barred by the defense of contributory negligence.[3] Nixon argues that it is too early in the case to address whether contributory

---

[3] Under Virginia law, contributory negligence is a complete defense to a negligence claim. *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 405 n.6 (4th Cir. 2011). "Contributory negligence is an affirmative defense that must be proved according to an objective standard [of] whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances." *Estate of Moses ex rel. Sw. Va. Transit Mgmt. Co.*, 643 S.E.2d 156, 159–60 (Va. 2007). Contributory negligence is typically a question of fact for the jury. *Id.* at 160 (citation omitted). "The issue becomes one of law for the . . . court to decide only when reasonable minds could not differ about what conclusion could be drawn from the evidence." *Id.* (citation omitted).

12

negligence extinguishes her claim. The court agrees. Defendants did not cite, and the court could not find, any cases where the court barred a negligence claim for contributory negligence on a motion to dismiss. Moreover, contributory negligence is almost always a fact question, reserved for the jury. *See Turner v. Walmart Stores East, LP*, No. 4:20cv00041, 2021 WL 1783256, at *6 (W.D. Va. May 5, 2021). While contributory negligence may ultimately bar this claim, the court finds that Nixon has plausibly stated a claim for relief at this stage in the proceedings, and the court will deny Defendants' motion to dismiss as to Count IV.

**E.     Count V: Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must plead that: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe. *Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007). IIED is disfavored in the law. *Id.* at 187. As to the second element—the only element Defendants contest—courts are tasked with determining whether the wrongdoer's conduct is "so extreme and outrageous as to permit recovery." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006). Liability is only appropriate "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.*

Numerous cases illustrate a high bar for the kind of abhorrent and shocking conduct necessary to state a claim for IIED. *See, e.g.*, *Williams v. Agency, Inc.*, 997 F. Supp. 2d 409, 414 (E.D. Va. 2014) (after separated husband hired an agency to conduct surveillance on his

13

wife, an employee entered her property, recorded her having sex with another man inside of her home, and disseminated the video to her estranged husband); *Fuller v. Aliff*, 990 F. Supp. 2d 576, 578, 580–81 (E.D. Va. 2013) (two men were violently physically attacked after one disclosed that he was gay); *Faulkner v. Dillon*, 92 F. Supp. 3d 493, 496, 501 (W.D. Va. 2015) (boss repeatedly sexually assaulted the female employee).

Nixon's IIED claim is solely based on Kysela supplying her Clonazepam pills "without informing her of the addictive qualities of the drugs." (Compl. ¶ 83.) Nixon further alleges that Kysela gave her the pills as part of his scheme to keep coercing her into a sexual relationship with him. (*Id.* ¶ 84.) The court first notes that giving or distributing controlled substances to someone without a prescription is illegal. *See* Va. Code Ann. § 18.2-248 (2021). It is also inarguable that the distribution of controlled substances is highly prevalent in our society. While the complaint undoubtedly alleges unsavory, unfortunate, and illegal behavior, Nixon's complaint does not allege conduct that is "atrocious," "utterly intolerable in a civilized society," or "beyond all possible bounds of decency." *Harris*, 624 S.E.2d at 33. In other words, these allegations are not shocking; rather, they are unfortunately ubiquitous. The court will therefore grant Defendants' motion to dismiss as to Count V.

### F. Count VI: Declaratory/Injunctive Relief

Count VI is titled, "Injunctive Relief—Declaration of Contract as Void as Against Public Policy." Nixon requests that the court declare as void the oral agreement between Nixon and Kysela that Nixon would make payments on the loan (or that she would pay back Kysela for any payments he made on the loan). On the face of the complaint, it is unclear whether Nixon is requesting injunctive relief (a remedy) or a declaratory judgment under the

14

Declaratory Judgment Act, which allows courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Nixon's counsel clarified at the hearing that she is seeking a declaratory judgment, which is markedly different from injunctive relief. In any event, Nixon did not bring a claim under the Declaratory Judgment Act. As such, the court will strike Count VI, but grant Nixon leave to file an amended complaint to bring a proper claim for a declaratory judgment. The court will further deny Defendants' motion to dismiss Count VI as moot.

## IV. CONCLUSION

In sum, the court will grant in part and deny in part Defendants' motion to dismiss (ECF No. 19). Specifically, the court will:

(1) grant Defendants' motion to dismiss as to Count I (hostile work environment) and Count V (IIED);

(2) deny the motion to dismiss as to Count II (quid pro quo), Count III (breach of contract), and Count IV (gross negligence);

(3) strike Count VI, and deny Defendants' motion to dismiss Count VI as moot; and

(4) grant Nixon leave to file a second amended complaint within 14 days, if she chooses to do so.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 18th day of May, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE