**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division**

| | |
|---|---|
| TERESA D. NIXON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 5:21-cv-00011-TTC |
| | ) |
| KYSELA PERE ET FILS, LTD., et. al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, Teresa D. Nixon ("Ms. Nixon" or "Plaintiff"), by counsel, and hereby files her Second Amended Complaint for damages against the defendants, Kysela Pere et Fils, Ltd. ("Kysela Company" or "Company"), and Francis J. Kysela, V ("Mr. Kysela"). Together, Kysela Company and Mr. Kysela are referred to herein as "Kysela" or "Defendants." Nixon and Kysela are referred to herein as the "Parties."

In support of her Second Amended Complaint, Plaintiff states as follows:

## NATURE OF THE CASE

1. Plaintiff brings this action against Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII") for sexual harassment, including hostile work environment and quid pro quo discrimination. She brings related state law claims for breach of contract and gross negligence/ willful and wanton conduct.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over the federal law claims in this action pursuant to 28 U.S.C. § 1331 because the Complaint alleges violations under Title VII.

1

3. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims are "so related to the …. [federal claims] that they form part of the same case or controversy."

4. This Court has personal jurisdiction over the Defendants because they performed the acts complained of herein within this district.

5. On or about June 29, 2020, Plaintiff filed a Charge of Discrimination with the Washington Field Office of the Equal Employment Opportunity Commission (the "EEOC").

6. The EEOC issued Plaintiff a notification of her right-to-sue on or about January 25, 2021, which Plaintiff received shortly thereafter.

7. Venue is proper in this district and in this division by virtue of 28 U.S.C. §1391(b) because, among other reasons, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**PARTIES**

8. Plaintiff Teresa D. Nixon is a female resident of the Commonwealth of Virginia. She is a professional marketing executive who had a thirty-year successful career with a sales and marketing company.

9. Kysela Pere et Fils, Ltd is a corporation located at 331 Victory Rd., Winchester, VA 22602. The Company is one of the top specialty wine and spirit importers in the United States, providing products both at premier and value pricing from over 200 wineries in thirteen countries. These products include fine wines, craft beers, hard cider, whiskey and other hand-crafted spirits, and sake.

10. Francis J. Kysela, V is the founder and sole owner of Kysela Pere et Fils, Ltd., and is a director and officer of the corporation, and is its registered agent.

11. For some of the time periods relevant to this action, Ms. Nixon was employed by Kysela Pere et Fils, Ltd. at its office location in Winchester, VA.

## FACTUAL BACKGROUND

12. In 2013, Ms. Nixon and Mr. Kysela engaged in a consensual, romantic relationship. At the time, Mr. Kysela was married and Ms. Nixon was legally separated.

13. The relationship between the parties became an "on again, off again" affair.

14. Mr. Kysela used a variety of plans, tactics, and schemes designed to pressure, compel, and hold Ms. Nixon in their sexual relationship.

Employment

15. In 2014 Mr. Kysela encouraged Ms. Nixon to set aside a successful 30-year career to work for the Kysela Company. She agreed.

16. Mr. Kysela's employment of Ms. Nixon would become his main vehicle to coerce her to continue her sexual relationship with him. In each of the instances outlined below, Mr. Kysela made decisions about Ms. Nixon's employment based on the status of the sexual relationship between the two.

17. On May 26, 2016 Mr. Kysela terminated Ms. Nixon's employment after another "off again" cycle in their sexual relationship.

18. In September 2016 he re-employed Ms. Nixon.

19. In May 2017 Mr. Kysela terminated Ms. Nixon's employment yet again. He drafted a separation agreement for Ms. Nixon but it was not finalized because Nixon resumed their sexual relationship.

20. In September 2017, Mr. Kysela "fired" Ms. Nixon yet again, but her employment never really ended.

21. In June 2018 Mr. Kysela downgraded Ms. Nixon's job responsibilities. Then he showed up at her house on July 3, 2018, climbed a ladder and entered through an open door while Ms. Nixon was in the shower, and convinced her to have sex with him.

22. In a November 1, 2018 email to Ms. Nixon that was part of an email string related to sex, Mr. Kysala said, "If you take care of me, I take care of you … that's how life works … you deny me and we have issues …"

23. Ms. Nixon became extremely nervous about the status of her employment. Her daughter was in college and this caused Ms. Nixon financial strain. Ms. Nixon feared losing her job due to her financial situation.

24. Ms. Nixon came to believe that her ability to keep her job was based on the continuation of her sexual relationship with Mr. Kysela. She was terrified if she ended the sexual relationship she would be fired, so she felt pressured to continue to have sex with Mr. Kysela, which she may not have done but for her concern of losing her job.

25. Mr. Kysela at times singled Ms. Nixon out for criticism in front of other employees during sales staff meetings. For example, he would criticize Ms. Nixon for texting on her phone, even though others were texting and were not criticized. Ms. Nixon believed this was an effort by Mr. Kysela to create fear in Ms. Nixon's mind, such that she would feel pressure to continue the sexual relationship in order to keep her job.

26. On other occasions Mr. Kysela did not make a sales folder for Ms. Nixon for a planned sales meeting, even though others in the meeting were given a folder. This was a way of embarrassing Ms. Nixon if Mr. Kysela was angry with her.

27. Mr. Kysela manufactured contrived criticisms of Ms. Nixon's job performance. For example, he took accounts away from her which made her unable to meet the annual sales

bonus structure. He then claimed she failed to meet quota. In so doing, Mr. Kysela created false "problems" with her performance so he could then "reward" her if she continued to have sex with him. These actions placed additional pressure on Ms. Nixon as the implication was that she had to have sex with Mr. Kysela to keep her job due to his contrived criticisms.

28. On another occasion, Ms. Nixon was sexually harassed and sent an explicit photo by an employee. Mr. Kysela forced Ms. Nixon to sign a document saying she did not want to pursue a civil action. The person harassing her was a good friend of Mr. Kysela's son.

29. Such actions placed severe strain on Ms. Nixon, causing her headaches and stress over potentially losing her job. Ms. Nixon was eventually diagnosed with Chronic Tension Headaches which required regular medication for over a year. This condition caused Ms. Nixon pain in the workplace and interfered with her ability to do her job as well as she otherwise could have performed.

30. In January 2019 Ms. Nixon resigned from Kysela Company and took new employment.

31. After Ms. Nixon's January 2019 resignation, Mr. Kysela convinced Ms. Nixon to remain part time with the Company and later to quit her other job.

32. On February 8, 2019 Mr. Kysela told Ms. Nixon "I wished we had lived together and you were my assistant for life."

33. On July 31, 2019 Mr. Kysela, on behalf of Kysela Company, signed yet another employment contract with Ms. Nixon (hereinafter "the Contract"). (A copy of the Contract is attached to the original Complaint as Exhibit 1.)

34. Mr. Kysela offered Ms. Nixon the Contract in order to induce Ms. Nixon to stay in a sexual relationship with him and to have it as a tool to keep her in the relationship by tying her continued employment to meeting his sexual desires.

34. Under the Contract, the Company agreed to employ Ms. Nixon for a three-year term.  Under Section 7 of that contract, the Company could only terminate Ms. Nixon's employment for one of four reasons:

(1) conduct evidencing substance abuse or dishonesty that affects its business interests,

(2) failure to meet sales goals,

(3) her breach of contract terms, or

(4) Kysela's dissatisfaction with job performance *if* the Company provides thirty day's written notice.

35. On August 4, 2019, Mr. Kysela agreed to Ms. Nixon's request / statement that their relationship would be business only.  But he continued to pursue sex with her.  Sometimes she gave in.

36. By September 27, 2019 Ms. Nixon was seeing a counselor and trying to get out of her sexual relationship with Mr. Kysela.

37. On September 29, 2019, Ms. Nixon again terminated her sexual relationship with Mr Kysela.

38. That same day, in response to Ms. Nixon's termination of the sexual relationship, Mr. Kysela, acting for the Kysela Company, fired her.

39. Mr. Kysela's termination of Ms. Nixon's employment did not meet any of the delineated reasons to support termination as listed in the Contract.

The BB&T Loan

40. In November 2017 Mr. Kysela developed a new scheme to enhance Ms. Nixon's dependence on him as a way of exerting control over her. Under his plan, Mr. Kysela and Ms. Nixon took out a $60,000 loan with BB&T bank. It was Mr. Kysela's credit that supported the loan. Mr. Kysela gave the money to Ms. Nixon, and they orally agreed she would make the payments to BB&T. This oral agreement is referred to herein as "the BB&T Agreement."

41. Alongside the BB&T Agreement, Mr. Kysela presented Ms. Nixon with an employment contract with Kysela Company to tie her employment to Kysela for five years or until refinancing of the debt. Mr. Kysela's motivation was to hold Ms. Nixon in a sexual relationship with him during the pendency of the BB&T Agreement repayment by keeping her employed by him, where he could maximize his leverage over her.

42. There is a little under $52,000 still owed on this debt to BB&T.

Ms. Nixon's Home

43. In November 2013 Mr. Kysela developed a plan to give him control over Ms. Nixon in order to keep their (at the time still new) relationship in place. He purchased Ms. Nixon's home and told Ms. Nixon to finalize her own divorce, and then buy her home back from Mr. Kysela when she was back on her feet again financially.

44. Ms. Nixon agreed and she and her daughter continued to live in that home as renters.

45. Over time Mr. Kysela used his ownership of the home as another way to continue to coerce sex from Ms. Nixon.

46. On December 23, 2016 Ms. Nixon signed a contract to purchase a townhouse. When Mr. Kysela found out, and realized that such a purchase would deprive him with one of his

chosen means of control over Ms. Nixon, he threatened to fire her if she did not remain in the house that he now owned.

47. In April 2017 he removed Ms. Nixon from a business trip in Europe because she went forward with purchasing the town house.

Illegal Prescription Drugs

48. In February 2014 Mr. Kysela provided Ms. Nixon with what he said were sleeping pills. In fact, the prescription was for Clonazepam, an addictive narcotic.

49. Mr. Kysela acquired these pills through his own prescription.

50. Mr. Kysela did not tell Ms. Nixon the pills were addictive and encouraged her to take them to help her sleep.

51. Ms. Nixon complied, and became dependent upon them.

52. On one occasion Mr. Kysela withheld pills from Ms. Nixon when she declined to accompany him on a business trip, where his intent for the trip was to engage in sexual activity with Ms. Nixon.

53. After terminating Ms. Nixon's employment for the final time in September 2019, he mailed Ms. Nixon additional pills.

54. These pills caused significant harm to Ms. Nixon, who lost sleep and suffered other damages and injuries from taking them.

55. When that supply was finished, Mr. Kysela did not supply any further drugs.

56. With the help of her medical provider, Ms. Nixon has stopped taking these pills and no longer has a medical, physical, or psychological need to do so.

57. Mr. Kysela's intent in providing Ms. Nixon with the drugs initially, and then continuing to do so, was to induce Ms. Nixon's addiction and use such dependence as an additional means of controlling her, including controlling her sexual relationship with him.

Consequences of Mr. Kysela's actions

58. Mr. Kysela is the sole owner of Kysela Company and all his actions were designed both to use his leverage as the company owner to achieve his personal sexual desires and to use his personal leverage for his business needs. Kysela Company and Mr. Kysela were alter egos of each other in these regards.

59. Ms. Nixon suffered significant emotional harm as a result of Kysela's actions including Chronic Tension Headaches that required medication, on the job stress and tension, use and dependence on narcotics, the pain of withdrawal from use, severe emotional distress, disruption of personal friendships and relationships, medical expenses, lost wages (past, present, and future), embarrassment, shame, humiliation, and loss of professional reputation.

60. Kysela's actions were intentional, severe, beyond the pale of actions acceptable to civilized society, and designed to give him control over Ms. Nixon and to cause physical and emotional harm. As such, these actions support an award of punitive damages against both Mr. Kysela and Kysela Company.

61. Ms. Nixon has incurred significant expense for attorneys' fees and litigation costs as a result of defendants' actions.

## COUNT I
### (Title VII – Hostile Work Environment)
### (Against Kysela Company Only)

62. Plaintiff restates and re-alleges the allegations contained in the preceding paragraphs of the Factual Background section as if fully set forth herein.

63. Mr. Kysela's tactics to pressure Ms. Nixon for sex, including threats of termination, reduction of job responsibilities and opportunities, and serial employment contracts designed as responses to changes in the Parties' sexual relationship, all served to create a hostile work environment for Ms. Nixon, thereby affecting the conditions of her employment in a severe and pervasive manner. The hostile work environment was a "continuing action" reaching back to the beginning of Ms. Nixon's employment.

64. Mr. Kysela manufactured contrived criticisms of Ms. Nixon's job performance. In so doing, Mr. Kysela created false "problems" with her performance so he could then "reward" her if she continued to have sex with him.

65. Such actions placed severe strain on Ms. Nixon, causing her headaches and stress over potentially losing her job. Ms. Nixon was eventually diagnosed with Chronic Tension Headaches which required regular medication for over a year. This condition caused Ms. Nixon pain in the workplace and interfered with her ability to do her job as well as she otherwise could have performed.

66. Mr. Kysela embarrassed Ms. Nixon in front of co-workers as a way of showing her what would happen if she crossed him. In so doing, he made it clear that having sex with him was

required for keeping her job. This caused her to feel sick and exhausted at work, both physically and mentally, and making her working conditions horrendous.

67. Plaintiff was subjected to this environment and the lingering threat of termination up until her actual termination.

68. Tying employment to a sexual relationship creates a hostile work environment. Termination for ending such a relationship is wrongful under Title VII.

69. As such, Kysela Company is liable for violation of Ms. Nixon's rights under Title VII.

70. As a result of Defendants' discrimination, Plaintiff suffered, and continues to suffer, severe emotional distress, disruption of personal friendships and relationships, medical expenses, lost wages (past, present, and future), embarrassment, shame, humiliation, loss of professional reputation, dependence on narcotics, the pain of withdrawal from drug use, loss of self-esteem, and heightened anxiety.

## COUNT II
### (Title VII – Quid Pro Quo Discrimination - Termination of Employment)
### (Against Kysela Company Only)

71. Plaintiff restates and re-alleges the allegations contained in the preceding paragraphs of the Factual Background section as if fully set forth herein.

72. As a result of Mr. Kysela's tactics to pressure Ms. Nixon for sex, including threats of termination, reduction of job responsibilities and opportunities, and serial employment contracts designed as responses to changes in the Parties' sexual relationship, Plaintiff's job benefits were contingent on sexual favors.

73. Plaintiff sought assistance to stop submitting to Mr. Kysela's tactics and deny any further attempts to induce sexual encounters.

74. Plaintiff's employment with Kysela Company was terminated because she ended her sexual relationship with Mr. Kysela and indicated there would be no more sexual encounters.

75. Terminating employment because Ms. Nixon indicated there would be no more sexual encounters is in violation of Title VII.

76. Plaintiff suffered an adverse action subsequent to her termination of the quid pro quo relationship when Defendant terminated her.

77. As a result of Defendants' discrimination, Plaintiff suffered, and continues to suffer, severe emotional distress, disruption of personal friendships and relationships, medical expenses, lost wages (past, present, and future), embarrassment, shame, humiliation, loss of professional reputation, dependence on narcotics, the pain of withdrawal from drug use, loss of self-esteem, and heightened anxiety.

## COUNT III
### (Breach of Contract)
### (Against Kysela Company Only)

78. Plaintiff restates and re-alleges the allegations contained in the preceding paragraphs of the Factual Background section as if fully set forth herein.

79. Plaintiff's Employment Contract of July 31, 2019 contained a finite list of enumerated reasons, which were the only reasons for which Ms. Nixon's employment could be terminated under the Contract.

80. None of the enumerated reasons in the Contract supported Ms. Nixon's termination.

81. In fact, Ms. Nixon was terminated because she ended her sexual relationship with Mr. Kysela.

82. Termination for that reason was not permitted by the terms of the Contract.

83. Plaintiff was entitled to three more years of employment under the Contract.

84. As such, Plaintiff was set to earn $330,000 in wages for the remainder of the Contract.

85. As a result of Defendant Kysela Company's breach of contract, Plaintiff incurred wage loss of $330,000, plus the value of employment benefits.

## COUNT IV
### (Gross Negligence / Willful and Wanton Conduct)
### (Against Both Mr. Kysela and Kysela Company)

86. Plaintiff restates and re-alleges the allegations contained in the preceding paragraphs of the Factual Background section as if fully set forth herein.

87. By using his own Clonazepam prescription to provide the drugs to Ms. Nixon, encouraging her to take them, and not telling her the drugs were addictive, Mr. Kysela caused Ms. Nixon to become dependent on the drugs and to need medical assistance to break the dependency.

88. Mr. Kysela's actions were grossly negligent, intentional, and/or done with willful and wanton disregard for Ms. Nixon's health and safety.

89. Mr. Kysela's conduct was egregious, beyond the pale, and beyond the bounds of decency for someone in civilized society.

90. Mr. Kysela's actions involved his supervisory authority as Mr. Nixon's employer, as well as his personal leverage as someone in a sexual relationship with Ms. Nixon. Such apparent use of supervisory authority establishes Kysela Company's *respondeat superior* liability for Mr. Kysela's actions.

91. Kysela's gross negligence and/or willful and wanton conduct caused considerable harm to Ms. Nixon's health and enjoyment of life.

92. Kysela's gross negligence and/or willful and wanton conduct caused wage loss and incurrence of medical expenses.

93. Kysela's actions were so grossly wrong, and outside the bounds of civil decency, as to support an award of punitive damages.

94. As a result of Kysela's gross negligence and/or willful and wanton conduct, Plaintiff suffered, and continues to suffer, severe emotional distress, disruption of personal friendships and relationships, medical expenses, lost wages (past, present, and future), embarrassment, shame, humiliation, loss of professional reputation, dependence on narcotics, the pain of withdrawal from drug use, loss of self-esteem, and heightened anxiety.

## COUNT V
### (Intentional Infliction of Emotional Distress)
### (Against Both Mr. Kysela and Kysela Company)

95-100. This Count was dismissed pursuant to the Court's order dated May 18, 2021. Plaintiff has opted not to amend her allegations to revive this Count.

## COUNT VI
### (Injunctive Relief – Declaration of Contract as Void as Against Public Policy)
### (Against Mr. Kysela Only)

101-107. This Count was dismissed pursuant to the Court's order dated May 18, 2021. Plaintiff has opted not to amend her allegations to revive this Count.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, Teresa D. Nixon, demands judgment against the defendants, Kysela Pere et Fils, Ltd., and Francis J. Kysela, V, as follows:

(a) For violations of Title VII, lost wages (past, present, and future) against Kysela Pere et Fils in excess of $200,000 or in an amount to be proven at trial;

(b) $50,000.00, or such greater amount as may be awarded by the jury and permitted by statute, in compensatory damages against Kysela Pere et Fils for violations of Title VII:

(c) $50,000.00, or such greater amount as may be awarded by the jury and permitted by statute, in punitive damages against Kysela Pere et Fils for violations of Title VII;

(d) $330,000 for damages for breach of contract against Kysela Pere et Fils;

(e) $250,000 in damages for gross negligence and/or willful and wanton conduct against Francis J. Kysela, V and Kysela Pere et Fils, Ltd.;

(f) $350,000 in punitive damages against Francis J. Kysela, V and Kysela Pere et Fils, Ltd., arising out of gross negligence and willful and wanton conduct.

(g) Plaintiff's attorneys' fees and court costs as provided by statute;

(h) Pre- and post-judgment interest; and

(i) All other further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

_____/s/ *John C. Cook* _____
John C. Cook, VSB No. 38310
Philip C. Krone, VSB No. 87723
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(T): (703) 865-7480
(F): (703) 434-3510
jcook@cookcraig.com
pkrone@cookcraig.com
*Counsel for Plaintiff*

## Certificate of Service

I hereby certify that on this 28th day of May, 2021, I served a copy of this Second Amended Complaint on counsel for the defendant, through the Court's electronic filing system and via regular mail, postage prepaid, addressed as follows:

    Thomas L. McCally, Esq., *pro hac vice*
    Janette M. Blee, Esq., Va Bar 30604
    Carr Maloney, P.C.
    2020 K Street, N.W.
    Suite 850
    Washington, DC 20006
    Janette.blee@carrmaloney.com

                                                                          /s/John C. Cook/
                                                                          John C. Cook, Esq.