IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| TERESA NIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00011 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KYSELA PERE ET FILS, LTD., *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |         United States District Judge |
| Defendants. | ) | |

Defendant Francis J. Kysela, V ("Kysela") and his company, Defendant Kysela Pere et Fils, LTD. ("the Company"), move for summary judgment on Plaintiff Teresa D. Nixon's claims of sexual harassment, breach of contract, and gross negligence.  The Company is an international wine and spirits distributor based in Winchester, Virginia, and Kysela is its president and owner.  Beginning in 2013, and continuing for nearly six years, Nixon and Kysela were engaged in a romantic relationship.  During four of those six years—from 2015 until their relationship finally ended in late September 2019—Kysela also employed Nixon as a wine salesperson at the Company.  According to Nixon, Kysela fired her from the Company because she ended their relationship for good.  In so doing, Nixon contends that Kysela engaged in quid pro quo sexual harassment, in violation of Title VII of the Civil Rights Act of 1964.

But as explained below, Nixon has failed to establish a genuine issue of material fact as to certain elements of her prima facie case of quid pro quo sexual harassment, and Defendants are entitled to summary judgment.[1]

## I.   BACKGROUND

### A.  Nixon and Kysela's Personal Relationship

Nixon and Kysela initiated a romantic relationship in 2013.  (Dep. of Teresa Nixon 37:11–38:6, Nov. 11, 2021 [ECF No. 59].)  At that time, Kysela was still married, and Nixon was legally separated from her spouse.  Both parties agree that the relationship was passionate and volatile from the beginning.  During good times, Nixon and Kysela regularly expressed their mutual affection, "exchanged amorous text messages, sent each other nude photographs of themselves, planned to rendezvous for sexual encounters, traveled extensively together for work and pleasure, and attended family holiday events together."  (Defs.' Br. Supp. Mot. Summ. J. Statement of Undisputed Material Facts ["SUMF"], ¶¶ 7–8 [ECF No. 52].)[2]  Kysela regularly spent time at Nixon's home and grew close to her daughter.  (Id. ¶ 8.)

Other aspects of their personal relationship were, to say the least, unusual.  At various times, Kysela provided generous financial support to Nixon.  In 2013, while Nixon was finalizing her divorce and undergoing personal financial difficulties, Kysela purchased her home and allowed Nixon and her daughter to live there, sometimes rent-free.  (Dep. of Francis Kysela 170:20–171:4, Nov. 23, 2021 [ECF No. 60].)  In 2017, Kysela co-signed a $60,000 bank

---

[1] The court will also grant Defendants' motion for summary judgment on Nixon's breach of contract and gross negligence claims.

[2] Citations to "SUMF" refer to the Defendants' statement of undisputed material facts as included in their brief in support of summary judgment (ECF No. 52).  All cited portions of the SUMF are undisputed (or undisputed as to the relevant fact) by Nixon.  (See ECF No. 55.)

loan for Nixon.  (*Id.* at 12:15–13:13; Nixon Dep. at 308:18–310:4.)  And it is undisputed that throughout their relationship, Kysela regularly gave Nixon money for various living and personal expenses.

But Kysela's financial generosity came with a catch.  In exchange for his financial support, Kysela insisted that Nixon abide by certain terms and conditions, including that Nixon be "loyal" and "submissive" sexually.  (ECF No. 55-1, at 75.)  During their relationship, Kysela also shared his prescription Clonazepam[3] with her when she had difficulty sleeping. Nixon contends that she eventually became dependent on this drug, for which she blames Kysela, but claims that she didn't know the name of the medication until years later when she picked up a refill at the pharmacy.  Nixon further testified that she regularly sought and ingested Kysela's prescription willingly, knowing that it was illegal to do so.  (Nixon Dep. at 311:4–313:16.)

Despite all this, Nixon testified that, from its inception in 2013 until their final break-up in September 2019, their relationship was consensual and that she regularly expressed love and affection for Kysela.  (*See id.* at 37:9–41:21; 254:6–256:14; SUMF ¶ 6.)  Kysela confirmed as much at his deposition, and the amorous emails and text messages they exchanged over the years, up to and including the final days of their relationship in September 2019, corroborate

---

[3] Nixon characterizes Clonazepam as a "narcotic" in her complaint and opposition, but this is not true.  (Second Am. Compl. ¶ 94 [ECF No. 28]; Pl.'s Opp'n. at 1 [ECF No. 55].)  "Clonazepam is a benzodiazepine.  It is approved for the treatment of panic disorder, as well as certain types of seizure disorders.  However, benzodiazepines are also commonly used to treat difficulty sleeping and alcohol withdrawal." *Clonazepam (Klonopin)*, National Alliance on Mental Illness (last updated Sept. 2021), https://nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/Types-of-Medication/Clonazepam-(Klonopin).  The Drug Enforcement Administration classifies Clonazepam as a Schedule IV controlled substance. *Controlled Substances*, Drug Enforcement Administration (last updated Nov. 18, 2021), https://deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf.

this.  (*See, e.g.*, ECF Nos. 52-1, at 54–62; 56-1.)  For example, in August 2017, Nixon wrote: "Fran, I have never used you.  I've loved you deeply and have wanted to be with you for the rest of my life."  (ECF No. 52-1, at 93–94.)  Earlier that summer, Kysela expressed similar sentiments, writing: "Teresa—I loved you like no woman I have been with.  I know I don't always show it, but I do.  It's very sad that we could not work it out.  I would have taken care of you for years."  (*Id.* at 81.)  Over the course of six years, Nixon estimates that they ended the relationship—and then reconciled—at least 20 times.  (Nixon Dep. at 294:9–18; SUMF ¶ 4.)  As Nixon later described it, "Yes, there is a pattern throughout our unfortunate relationship."  (Nixon Dep. at 295:2.)

### B. Nixon and Kysela's Professional Relationship, Part 1: February 2015—January 2019

In early 2015, after they had been dating for over a year, Kysela hired Nixon to work at the Company as a sales representative.  The terms and conditions of her employment were set forth in the first of several employment agreements, which the parties signed on February 13, 2015.  (ECF No. 52-1, at 148.)  Nixon remained with the company for nearly four years, until she voluntarily resigned in January 2019 to seek other employment.  (Nixon Dep. at 254:10–18.)  For the most part, the parties' working relationship mirrored their tumultuous personal relationship and was "on again, off again" throughout this first period of employment.  Although it is undisputed that Nixon only met her $60,000 monthly sales objective once during her tenure, she nevertheless had some success with the Company. (SUMF ¶ 36.)  She helped Kysela market to prospective clients on business trips and at various events, and she performed some non-sales functions for the Company, including working in accounts receivables.  Indeed, despite Kysela's current characterization of Nixon's sales

performance as "unsatisfactory[,]" (Defs.' Br. Supp. Mot. Summ. J. at 2), he once described

her as a "very good business person and an assets [*sic*] to any company[,]" (ECF No. 52-1, at

104). On another occasion, Kysela called Nixon "an excellent business woman." (*Id.* at 145.)

But their working relationship was sometimes acrimonious. At a client dinner in May

2016, Nixon insulted Kysela in particularly vulgar terms, calling him a "pig," an "asshole," an

"arrogant bastard," and a "fucker." (*Id.* at 163.) And Nixon acknowledged using similar

obscenities to refer to Kysela in various work-related emails over the years. (Nixon Dep. at

114:17–122:21 (discussing e-mails where Nixon wrote to Kysela "[F]uck you . . . . Grow some

balls," and "[Y]ou're the biggest ass I've ever known").)

It is undisputed that Nixon's occasional professional animus towards Kysela—and, in

turn, his ill will towards her—usually stemmed from various grievances in, and the status of,

their personal relationship. Indeed, both parties readily acknowledged that their personal and

professional lives were inextricably intertwined. As Kysela put it, "It was all one thing."

(Kysela Dep. at 128:3.) Or, as Nixon described, "[I]t kind of crossed and blurred the lines

into the [C]ompany, because it all was together, basically." (Nixon Dep. at 43:20–22.)

On several occasions during Nixon's first period of employment with the Company,

Kysela considered firing her. In May 2016, following the incident when Nixon insulted him

at the client dinner, Kysela took preliminary steps to do so, but ultimately changed his mind.

Nixon also contemplated leaving the Company on numerous occasions, and she told Kysela

as much. There were myriad reasons why Nixon and Kysela almost ended their business

relationship, but the primary reason was undoubtedly the status of their sexual relationship.

Both Nixon and Kysela described the "on-again, off-again" nature of that sexual relationship and how that affected their relationship at work.  Nixon testified as follows:

> Q: And is it fair to say that from 2013 through 2019, when you left [the Company] you all were in an on-again, off-again consensual romantic relationship?
>
> A: True.
>
> Q: And this would—this on-again, off-again relationship occurred whether—during that time period whether you were employed or not employed by the [C]ompany; is that fair to say?
>
> A: I would say no, it's not fair to say.
>
> Q: And what's not fair about that?
>
> A: The relationship when it was off, it was off.  And at times— when time had passed or whatever occurred that brought us back together, normally it was—there was an agreement and we ended up working things out I would get reemployed.
>
> Q: Okay.  But you were—again when you were off that means were you not having sexual relations; is that what you mean?
>
> . . .
>
> A: I would avoid things as much as possible during those times.
>
> Q: But there were times even when you were off you had sexual relations?
>
> A: In order to gain my job back is generally what was going on. It was—it was on-again, off-again all the time.
>
> Q: And is it your testimony today that the only reason you had sexual relations with him was to get your job back?
>
> A: No, it is not.  It is not.
>
> Q: Then what did you mean by that?

> A: I meant that I did want my job back, of course, and I did want to be employed, I—there was fear of being unemployed, but at the time I cared for this person.
>
> Q:  In fact, you—many times you told him you loved him, correct?
>
> A: I did.
>
> Q:  That you couldn't live without him, correct?
>
> A:  Yes, people say that.
>
> Q:  And you said that?
>
> A:  Yes.

(*Id.* at 39:19–41:21.)  And Kysela has acknowledged that their sexual relationship was, in part, a motivation for employing her—at least the second time.  (*See* Kysela Dep. at 127:12–128:3.)

Despite having formal discussions about ending their professional relationship during her first period of employment, Nixon never, in fact, left the Company.  In July 2016, and again in June 2017, the parties executed separation agreements to terminate Nixon's employment.  (*See* ECF No. 52-1, at 172–76, 185–89.)  But on both occasions, the parties subsequently entered into new written employment agreements, and Nixon remained on the payroll.  (*See id.* at 148–55, 161–62, 177–84, 195–97.)  Nixon was "continuously employed and on [the Company's] payroll from February 2015 until her voluntary resignation in [January] 2019."  (SUMF ¶ 46.)

In January 2019, after being with the Company for nearly five years, Nixon "voluntarily resigned her employment."  (SUMF ¶ 35.)  It is undisputed that Nixon did this on her own volition to explore other professional opportunities, and that, at the time she left the Company, she and Kysela were "on again" in their relationship.  On January 23, 2019, Nixon sent Kysela

a text asking, "Do you want to have sex one last time at the Hampton Inn?" (ECF No. 52-1, at 59.) Two days later, at Kysela's request, Nixon texted him nude photos of herself. (Nixon Dep. at 263:19–265:22.) Their personal relationship continued, on relatively good terms, in the months following her resignation. Although they were not together continually, both parties testified that they regularly saw each other in the spring and summer of 2019, while Nixon was employed elsewhere. As Nixon described it, "I mean, we talked, we had dinner, we had sex, we were—like we were in a relationship again." (*Id.* at 254:6–256:14.)

### C. Nixon and Kysela's Professional Relationship, Part 2: August—September 2019

In late July 2019, Kysela decided to bring Nixon back to the Company. The parties executed a new employment agreement on July 31, 2019, establishing a three-year term of employment for Nixon in the roles of a sales representative and an accounts receivable specialist.[4] (ECF No. 55-1, at 58–66.) The employment agreement further provided that the Company could terminate Nixon early if any one of four listed conditions occurred:

    a. Conduct by Nixon evidencing substance or alcohol abuse or dependency, disloyalty, dishonesty, or any other conduct in contravention of the financial and business interests of [the Company]; or

    b. Nixon's failure to generate and attain minimum monthly sales of $70,000.00 per month by May 19th, 2020, which is nine (9) months from the beginning of this Agreement; or

    c. Nixon's breach of the terms and provisions hereof; or

    d. [The Company's] dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided [the Company] gives Nixon a 30-day written notice.

---

[4] The agreement stated that it would be effective August 19, 2019, and Nixon testified that was her actual start date. (*See* ECF No. 55-1, at 58; Nixon Dep. at 286:14–17.)

(*Id.* at 63.)  When Nixon and Kysela executed this agreement, they both expressed reservations about continuing their romantic relationship.  In a contemporaneous email exchange, Nixon wrote:

> I am happy to return to work with you, however please know that I won't interfere with you're [*sic*] extracurricular activities.  I do plan to move on with my life and relationships.  Hopefully, you will give me the same courtesy.  I won't entertain seeing you on a personal level ever again.  Best for both of us.

(ECF No. 52-1, at 146.)  Later that day, Kysela responded:

> I am excited for you to come back to work for [the Company].  I do think you're an excellent business woman. . . . Your personal life is your personal life.  It goes both ways.

(*Id.* at 145.)  But despite their best intentions, the personal relationship continued, just as it had during her prior employment with the Company.  As Nixon aptly put it, when she started working at the Company in August 2019, "It was on. . . . It was the same scenario as what we had previously been doing." (Nixon Dep. at 281:15–21.)  And it is further undisputed that the relationship continued through most of September.  On September 21, the parties exchanged "Love you" text messages (ECF No. 56-1) and, according to Nixon, they spent two evenings together the week before Kysela left for a short trip to Europe, sometime during the week of September 23 (Nixon Dep. at 296:15–297:3).[5]

    But while Kysela was in Europe, Nixon explains, she "decided that week to end my role in his life on a personal level. . . . It wasn't working and I was tired of it." (Nixon Answers

---

[5] Although Kysela vaguely recalled that the relationship ended in "early September" (Kysela Dep. at 149:15–150:4), his recollection is contradicted by Nixon's testimony and contemporaneous text messages.  As noted above, they were still exchanging amorous text messages as late as September 21, which corroborates Nixon's account that they spent evenings together around that time.  (*See* ECF No. 56-1; Nixon Dep. at 296:15–297:3.)

to Defs.' First Set of Interrogs. ¶ 7 [ECF No. 56-4]; *see* Nixon Dep. at 292:1–16.)   On September 23, Kysela emailed Nixon, suggesting they meet the following Sunday evening, September 29, when he was back from his trip. (ECF Nos. 56-5; 56-6; 55-1, at 68–71.)   In her response, Nixon declined, but she suggested that they have a phone call or a meeting the following Monday.   Kysela replied: "Why are you so unavailable love?" and then inquired where she would be on Sunday.   (ECF No. 55-1*, at 70.)   After some additional back and forth, Nixon responded: "I have nothing to vent to you.   We've said all that needs to be said.   It's over and done however,   I do like good conversation and will keep it to business."   (*Id.* at 68.)   To that, Kysela replied: "You're the problem child.   Behave and we'll be fine."   (*Id.*)   Nixon responded: "Stop being so mean.   I don't have a problem with you at all.   I just don't want to be involved personally.   It's not a healthy situation."   (*Id.*)   Kysela ended the exchange by writing: "You have many issues.   I have tried to help you over the years.   Relax here.   We will be fine."   (*Id.*)

Kysela and Nixon eventually spoke by phone on Sunday, September 29, after he had returned from Europe.   During this call, Nixon told him that their personal relationship was over.   In response, Nixon recalls that Kysela informed her that she would need to "transition out of the [C]ompany."   (Nixon Dep. at 292:14–293:19; Nixon Answers to Defs.' First Set of Interrogs. ¶ 7.)   Two days later, Kysela emailed Nixon to reiterate that she would need to "transition" out of the Company.   (Kysela Dep. at 153:20–155:19.)   After some additional back and forth, they agreed that she would work for an additional 30 days, leaving the Company for good on October 31, 2019.   (Nixon Dep. at 303:1–19; *see* ECF No. 55-1, at 73.)

Nixon testified that she and Kysela had no further sexual encounters following the September 29 call.  (Nixon Dep. at 301:3–302:17.)

### D. Procedural History

Nixon filed suit in February 2021, bringing six claims[6]: (1) hostile work environment in violation of Title VII against the Company; (2) quid pro quo sexual harassment under Title VII against the Company; (3) breach of contract against the Company; (4) gross negligence against the Company and Kysela; (5) intentional infliction of emotional distress against the Company and Kysela; and (6) a "count" for "Injunctive Relief—Declaration of Contract as Void as Against Public Policy" against Kysela.  Defendants filed a motion to dismiss, which the court granted in part and denied in part.  (*See* ECF No. 25.)  Specifically, the court granted the motion to dismiss Nixon's hostile work environment claim, holding that "[w]hile Nixon's allegations unquestionably describe an unhealthy relationship between her and Kysela, Nixon never raises any allegations regarding her working environment, nor does she describe how the conduct negatively impacted her performance."  (*Id.* at 7.)  The court also granted the motion to dismiss the claim for intentional infliction of emotional distress.  The court, however, denied the motion to dismiss the quid pro quo sexual harassment claim, the breach of contract claim, and gross negligence claim.[7]

Nixon then filed a second amended complaint, seeking to cure her pleading deficiencies with respect to her hostile work environment claim and bringing the claim against both

---

[6] In March 2021, Plaintiff filed an amended complaint, which included these same six claims.

[7] The court denied Defendants' motion to dismiss the claim for "Injunctive Relief" as moot, insofar as Plaintiff conceded that it was improperly pleaded and that she would seek leave to file an amended complaint curing this deficiency.  (ECF No. 25, at 14–15.)

Defendants.  Defendants filed a partial motion to dismiss the hostile work environment claim and the gross negligence claim as it pertained to the Company.  In August 2021, the court granted that motion, dismissing the hostile work environment claims and the gross negligence claim against the Company.  Regarding the reconstituted claim of hostile work environment, the court held that, "[e]ven with the additional allegations, the second amended complaint does not state a claim for hostile work environment because Nixon does not sufficiently allege that the unsavory *conditions* of her *job*—rather than her relationship—were so severe and pervasive as to change the conditions of her employment." (ECF No. 35, at 6.)

Following these rulings, the parties conducted discovery, and Defendants filed the instant motion for summary judgment.  (ECF No. 51.)  The court conducted a hearing on the motion on March 2, 2022, and the matter is ripe for decision.

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).  The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.  The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'"  *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252).  The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249.  "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it."  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

With respect to Nixon's Title VII claim, the summary judgment standard is refined by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213–18 (4th Cir. 2007).  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of sex discrimination.  411 U.S. at 802.  The plaintiff must establish this prima facie case by a preponderance of the evidence.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).  If she succeeds, "a

presumption of illegal discrimination arises, and the burden of production shifts to the employer" to put forward a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). At that point, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993). The burden returns to the plaintiff to establish, by a preponderance of the evidence, that the purported legitimate reasons cited by the employer are pretextual—that is, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. Stated differently, the plaintiff, in satisfying her pretext burden under the third prong of the *McDonnell-Douglas* test, must establish that the defendant's reason is false *and* that discrimination is the actual reason. *See Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (emphasis added).

### III.   ANALYSIS

#### A. Title VII: Quid Pro Quo Sexual Harassment

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Based on its plain language, courts have long recognized two types of sexual harassment that may be actionable under Title VII: (1) quid pro quo harassment; and (2) harassment that results

in an "intimidating, hostile, or offensive work environment," which is commonly referred to as "hostile work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

"The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms and conditions of employment and to explain the latter must be severe or pervasive." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id.* at 753–54. Under that scenario, a plaintiff establishes quid pro quo harassment. On the other hand, objectionable conduct that does not result in tangible adverse employment action, but is nevertheless severe or pervasive, gives rise to sexual harassment under a theory of hostile work environment. *Id.*

Although Nixon initially alleged both types of sexual harassment, the court dismissed her hostile work environment claim at the pleadings stage. Her quid pro quo harassment claim remains before the court.

### 1. Prima Facie Case

To establish a prima facie case of quid pro quo harassment, a plaintiff must prove five elements: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment was based on sex; (4) that "the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of

employment;" and (5) the employer knew (or should have known) of the harassment and failed to take appropriate action.  *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011).

Nixon contends that she suffered a tangible employment action when Kysela fired her on September 29, 2019, for breaking off their romantic relationship, thereby establishing a prima facie case of quid pro quo harassment.  Defendants argue that Nixon has failed to establish a prima facie case of quid pro quo harassment given their long-term, consensual romantic relationship.  Accordingly, Defendants assert that Nixon cannot satisfy the second, third, or fourth elements of her claim.

### a.  "Unwelcome Advances"

To satisfy the second element of her prima facie case under a quid pro quo theory, Nixon must produce some evidence that she considered Kysela's sexual advances "unwelcome" at the time he made them.  *Meritor Savings Bank*, 477 U.S. at 68 ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'").  "The correct inquiry is whether [a plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.*  "Advances are unwelcome if the plaintiff regarded them as undesirable or offensive and did not solicit or incite them."  *Briggs v. Waters*, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007) (citing *Lewis v. Forest Pharms., Inc.*, 484 F. Supp. 2d 638, 647 (D. Md. 2002)); *see also Rodriguez v. City of Hous.*, 250 F. Supp. 2d 691, 699 (S.D. Tex. 2003) (citing *Jones v. Flagship Int'l,* 793 F.2d 714, 719 (5th Cir. 1986) ("'[U]nwelcome sexual harassment' is defined, in this circuit, as 'conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee.'").

Courts have long recognized that when a plaintiff was in a consensual personal relationship with a work colleague at the time the sexual advances were made, it is difficult, if not impossible, to establish that they were unwelcome. *See., e.g., Souther v. Posen Constr., Inc.,* 523 F. App'x 352, 355 (6th Cir. 2013) ("[The plaintiff's] conduct during the relationship also demonstrates that the extramarital affair was not unwelcome.  The record shows that [the plaintiff] was a willing participant, even though [the defendant] was the one who put things into motion."); *Pipkins v. City of Temple Terr.,* 267 F.3d 1197, 1200 (11th Cir. 2001) ("[W]e find the consensual nature of the relationship between Houldsworth and Klein and any resulting feelings of enmity determinative."); *Mosher v. Dollar Tree Stores, Inc.,* 240 F.3d 662, 668 (7th Cir. 2001) ("Even viewing all the facts in the light most favorable to [the plaintiff], no reasonable jury could conclude that she was anything other than a willing participant in a long, consensual relationship with her boss."); *Moberly v. Midcontinent Commc'n,* 711 F. Supp. 2d 1028, 1038 (D.S.D. 2010) ("Here, [the plaintiff] admits that all of [her supervisor's] romantic and sexual advances were mutual before the November 2006 business trip to Minneapolis.  Thus, [her supervisor's] conduct and comments before this conversation cannot be considered unwelcome harassment even though they were sexual in nature.").

But a plaintiff can establish that the advances were unwelcome by showing that they occurred (or continued) following the termination of the consensual relationship. *See Ruggles v. Greco,* No. 14-1021, 2015 WL 1538803, at * 12 (E.D. La. Apr. 7, 2015) ("It is well established that [the parties'] relationship was consensual and [the plaintiff] has presented no evidence of [the defendant] subjecting her to unwelcome conduct before or after she terminated the relationship."); *Novak v. Waterfront Comm'n of N.Y. Harbor,* 928 F. Supp. 2d 723, 730 (S.D.N.Y.

2013) ("Where, as here, however, there is no evidence that the spurned supervisor made any sexual advances towards [the plaintiff] following their breakup, or engaged in other efforts to renew the relationship, there is no actionable Title VII violation."); *West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 543 (E.D. Va. 2002) (analyzing whether the defendant's numerous phone calls to plaintiff after the end of their consensual relationship established a quid pro quo sexual harassment claim, but ultimately concluding they did not because the plaintiff did not answer the phone); *see also Pipkins*, 267 F.3d at 1201 ("The court does not today decide that once a consensual relationship between a supervisor and a subordinate is established, the subordinate could never then become victim to quid pro quo sexual harassment by that supervisor subsequent to the termination of the relationship.").  Although the Fourth Circuit has never examined this issue in depth, it has recognized that a plaintiff who alleges that her supervisor made unwelcome sexual advances after the termination of their consensual relationship—and that she rebuffed those advances and suffered adverse employment action as a result—states a valid claim for quid pro quo sexual harassment.  *See Ford v. Simms*, 23 F. App'x 152, 154 (4th Cir. 2001) (finding that the plaintiff stated an actionable claim under Title VII when she was put on a probationary status after she refused her supervisor's attempt to renew their relationship that she ended seven years earlier); *see also Ellis v. Dir., Cent. Intel. Agency*, No. 98-2481, 1999 WL 704692, at *3 n.4 (4th Cir. Sept. 10, 1999) (affirming district court's grant of summary judgment and finding that plaintiff had "neither alleged nor proven any specific incidents of sexual conduct which were involuntary or 'unwelcome'" by the defendant during their 18-year relationship). Viewing the evidence in the light most favorable to Nixon, she has

not established a genuine issue of material fact that Kysela made any unwelcome advances towards her after their consensual relationship ended.[8]

Nixon focuses her opposition to Defendant's motion for summary judgment on her second period of employment—from early August to the end of September 2019. She makes two arguments that Kysela's conduct during this second, shorter stint was unwanted, but neither is persuasive.

First, Nixon contends that when she rejoined the Company in August, "she expressed to Mr. Kysela that she planned to move on with her life and relationships and, hoping Mr. Kysela would oblige, that she would not entertain seeing him in [*sic*] a personal level again." (Pl.'s Resp. Opp. Mot. Summ. J. at 15 [ECF No. 55].) According to Nixon, despite making her intentions plain, Kysela persisted in making sexual advances, and "the two ended up back

---

[8] The court fully recognizes that someone in a consensual romantic relationship could still be subjected to unwanted sexual advances by her (or his) partner during that relationship. In other words, the consensual nature of the relationship itself does not foreclose the possibility of experiencing specific unwanted sexual conduct during that relationship. But Nixon has adduced no credible evidence that Kysela made any unwanted sexual advances towards her during their overlapping personal and professional relationships.

It is undisputed that throughout Nixon's first period of employment—from early 2015 until she voluntarily resigned in January 2019—Nixon and Kysela were engaged in a passionate and tumultuous romantic relationship. That relationship began well over a year before Nixon joined the Company, and it continued until her departure in January 2019. Indeed, Nixon testified that she loved and cared for Kysela, and her recollection is overwhelmingly corroborated by the undisputed contemporaneous evidence, including scores of amorous—and occasionally explicit—text messages and emails, as well as the regular sexual encounters initiated by both parties. Nixon aptly described her feelings in August 2017: "Fran, I have never used you. I've loved you deeply and have wanted to be with you for the rest of my life." (ECF No. 52-1, at 93–94.) Moreover, it is undisputed that after resigning her position in January 2019, Nixon took affirmative steps to maintain their relationship—sending Kysela nude photographs of herself and suggesting that they rendezvous at a local hotel—and their relationship continued for several months afterward. Both parties testified that they regularly saw each other in the spring and summer of 2019, even though Nixon was no longer with the Company. As Nixon described it, "I mean, we talked, we had dinner, we had sex, we were—like we were in a relationship again." (Nixon Dep. at 254:6–256:14.) Based on this record, Nixon cannot establish a genuine issue of material fact that she experienced unwanted sexual advances during her first period of employment. *See Moberly*, 711 F. Supp. 2d at 1038 (recognizing that for as long as romantic and sexual advances between plaintiff and defendant were mutual, they cannot be considered unwelcome for purposes of a quid pro quo claim). And at oral argument, plaintiff's counsel conceded that Nixon was not subjected to unwanted sexual advances during her first period of employment.

in a sexual relationship." (*Id.*)  Nixon argues that even though she "gave in to Mr. Kysela's advance [that] does not mean the advance was welcome." (*Id.*)

The record undermines this revisionist history.  When Nixon and Kysela began discussing Nixon's return to the Company, in July 2019, they were still in an "on again, off again" personal and sexual relationship, as they had been since she resigned in January (and had been for the better part of six years).  (Nixon Dep. at 254:10–256:14; Kysela Dep. at 127:1–128:3; SUMF ¶ 13–15.)  Although the parties exchanged emails at the beginning of August expressing their mutual desire to keep their renewed working relationship strictly professional (*see* ECF No. 52-1, at 145–46), it is undisputed that their consensual sexual relationship, which had been ongoing for months prior, continued afterwards, just as it always had. As Nixon testified: "It was on [again]. . . . It was the same scenario as what we had previously been doing." (Nixon Dep. at 281:3–21.)  And it is further undisputed that, except for "a couple days" in early August, the relationship remained "on" throughout most of August and September.  (*Id.* at 298:14–300:08.)  On September 21, the parties exchanged text messages expressing their mutual love and, according to Nixon, they spent two evenings together the week of September 23, before Kysela left for a business trip to Europe.  (*See* ECF No. 56-1; Nixon Dep. at 296:15–297:3.)  Nixon, in sum, has put forth no evidence she experienced any unwanted sexual advances shortly after she returned to the Company.

Second, Nixon contends that she experienced an unwelcome sexual advance from Kysela over email on September 23, 2019, while he was on a business trip to Europe.  Even though they were on good terms—or "on again"—when Kysela departed for Europe, Nixon apparently decided that she wanted to end their relationship while he was away.  As she

explained it at her deposition, at some point that week, Nixon realized that their personal relationship needed to come to an end.  (Nixon Dep. at 292:1–293:6.)  "It wasn't working and I was tired of it," she testified.  (*Id.* at 292:13.)  But it is also undisputed that Nixon did not tell Kysela it was over until *after* he emailed her on September 23, asking if she would be available to see him the following Sunday.  (Nixon Answers to Defs.' First Set of Interrogs. ¶ 7; *see* Nixon Dep. at 292:1–293:6; ECF Nos. 56-5; 56-6; 55-1, at 68–71.)  According to Nixon, this request was implicitly a sexual advance, insofar as Kysela asked to meet in-person on a Sunday evening, ostensibly to discuss work.  While this is a fair reading of the email given the nature and status of their relationship, Nixon had not yet broken off the relationship or expressed any intention to do so before Kysela sent that email.  To the contrary, Nixon only expressed that desire in the ensuing email exchange, wherein she responded: "I have nothing to vent to you.  We've said all that needs to be said.  It's over and done however, I do like a good conversation and will keep it business."  (ECF No. 55-1, at 68.)[9]

Until that point, Nixon had given Kysela no indication—through verbal or electronic communication, her conduct, or otherwise—that further romantic entreaties would be unwelcome.  Just days before, they had spent two evenings together and expressed their mutual affection over text messages.  Indeed, Kysela's initial response—"Why are you so

---

[9] The court acknowledges that, even after Nixon expressed to Kysela that their relationship was "over and done" during this e-mail exchange, Kysela made two other comments, but neither of these amounts to an "unwelcome sexual advance" for purposes of a Title VII quid pro quo claim.  First, Kysela responded, "You're the problem child.  Behave and we will be fine."  (ECF No. 55-1, at 68.)  Nixon replied, "Stop being so mean.  I don't have a problem with you at all.  I just don't want to be involved personally.  It's not a healthy situation."  (*Id.*)  And Kysela wrote, "Teresa, You have many issues.  I have tried to help you over the years.  Relax here.  We will be fine."  (*Id.*)  While Kysela's remarks express his belief that the relationship was still salvageable, they do not amount to "conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive . . . ."  *Rodriguez,* 250 F. Supp. 2d at 699.

unavailable love?"—indicates that he was surprised by this turn of events.  (*See id.* at 70.)  Thus, Kysela's September 23 email—to the extent it can be construed as a romantic or sexual advance—cannot be deemed unwelcome because Kysela did not know that their relationship had ended.  *See Meritor*, 477 U.S. at 19 ("The correct inquiry is whether [a plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome . . . . [T]he trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." (cleaned up)).  And Nixon's testimony about their ensuing limited interactions forecloses any possibility that she experienced any unwanted sexual advances following this email exchange.  According to Nixon, Kysela made no further advances—unwanted or otherwise—when they next spoke on September 29 and she reiterated her desire to end the relationship, or at any other time during her final month with the Company.  (Nixon Dep. at 301:3–302:17.)

Because Nixon has failed to establish a genuine issue of material fact that Kysela subjected her to *unwanted* sexual advances at any time during her two periods of employment, she has failed to establish the second element of a prima facie case of quid pro quo harassment under Title VII.

### b.  "Based on Sex"

Even if Nixon could establish that Kysela subjected her to unwelcome advances after ending their consensual relationship, she cannot establish the third element—that any

purported harassment or the resulting employment consequences were "based on sex" for purposes of a Title VII quid pro quo harassment claim.[10]

Most courts that have examined this issue have concluded that in the context of failed consensual relationships ("break-ups"), the motivating animus is personal in nature and stems from the defendant's bruised feelings rather than the plaintiff's sex. *See Ford*, 23 F. App'x at 153–54 (affirming the district court's dismissal of plaintiff's claims to the extent they demonstrated that the adverse employment actions "were not caused by her [sex] but by personal animosity stemming from her failed consensual sexual relationship with her supervisor"); *Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903, 908–10 (8th Cir. 2006) (holding that "termination of an employee based on the employee's admitted consensual sexual conduct with an employer or supervisor . . . does not amount to discrimination on the basis of the employee's status as a man or a woman; rather, it is based on the employee's own actions and therefore is permissible under Title VII"); *Pipkins*, 267 F.3d at 1200–01 (holding that any negative employment actions taken by the plaintiff's ex-romantic partner were based on "his disappointment in their failed relationship," and that the plaintiff's supervisor's actions were likewise based on "personal animosity" due to her friendship with the romantic partner's wife); *West*, 205 F. Supp. 2d at 545 ("Courts have consistently drawn the distinction between actions based on discriminatory animus and those based on personal animosity resulting from failed consensual relationships . . . . [N]egative employment actions which follow on the heels of a

---

[10] The third element of a prima facie case of quid pro quo sexual harassment claim requires the plaintiff to show that "[t]he harassment complained of was based upon sex." *See Okoli*, 648 F.3d at 222. But, in analyzing these claims, courts often conflate the second, third, and fourth elements and analyze whether the harassment complained of *and* the resulting consequences were based upon sex. *See Ford*, 23 F. App'x at 153–54; *Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903, 909–10 (8th Cir. 2006); *West*, 205 F. Supp. 2d at 544–45.

consensual relationship gone sour do not constitute quid pro quo sexual harassment unless they are linked in some way to other or further unwanted sexual advances." (cleaned up)); *Novak*, 928 F. Supp. 2d at 730–31 (adverse employment actions following the end of a consensual sexual relationship "while unfair and unfortunate, do[] not constitute Title VII sex discrimination").[11]

Nixon's case confronts the same issue. The overwhelming evidence in the record demonstrates that any animus Kysela had against Nixon stemmed from his personal feelings and disappointment with the end of their relationship—not the fact that she is a woman. Kysela's personal animus is not an unlawful discriminatory animus and is therefore not actionable under Title VII.

The unique facts of Nixon's case make it even more challenging for the court to conclude that Kysela's actions were based on discriminatory rather than personal animus. Nixon and Kysela began their relationship *before* Nixon ever became employed with the Company. Kysela later decided to hire Nixon, his paramour, to work with him. This situation materially differs from the more common factual scenario where a supervisor begins a relationship with one of his or her current employees.

The pair continued a tumultuous personal and professional relationship for years. Nixon's performance at the Company consistently fell below average and she only ever hit her monthly sales goal on one occasion. (*See* SUMF ¶ 36.) Nonetheless, she remained employed

---

[11] This majority has, at times, been questioned. *See Moberly*, 711 F. Supp. 2d at 1039 ("But the Eight Circuit has not adopted a bright[-]line rule that harassing conduct in such a situation is presumed or automatically found to be caused by the plaintiff's former romantic involvement with the alleged harasser, rather than the plaintiff's sex."). Nevertheless, looking at the record as a whole, Nixon has not created a genuine dispute of material fact that Kysela fired her because of her sex rather than because of her status as his former romantic partner.

(to varying degrees) even as the relationship fell into "off" periods.  Defendants rely on this fact to argue that Nixon's employment was not tied to her relationship with Kysela, but this is disingenuous.  Considering the record as a whole, it is fair to conclude that, if not for her relationship with Kysela, Nixon would not have been hired in the first place.  And if not for her relationship with Kysela, Nixon's repeated failure to meet sales targets may have resulted in her termination.[12]  But Kysela cared for Nixon and expressed that he wanted to see her succeed at the Company, so he allowed her to continue her employment.  (*See* Kysela Dep. at 120:1–7 ("I love Teresa and I like taking care of her and I like giving her a second chance.").)

Nixon's employment with the Company arose from her relationship with Kysela; once that relationship officially ended, so did her employment.  To be sure, it is ill-advised to hire an on-again, off-again lover, keep her employed throughout the relationship despite her poor job performance, and fire her when the relationship ends.  But presented with this scenario and given the facts in the record, the court must conclude that Kysela's actions[13] were based on his personal feelings about the ending of their long-term consensual relationship, not Nixon's sex.

In sum, Nixon has also failed to establish a genuine issue of material fact that Kysela terminated her employment because of her sex and thus, the third element of her prima facie

---

[12] Defendants also attempt to portray the true reason for Nixon's firing as her failure to meet her montly sales goals in September 2019 and the Company's need to cut employees in the face of heightened import taxes.  (*See* Defs.' Br. Supp. Mot. Summ. J. 21–22.)  While it is unnecessary—given Nixon's failure to make out a prima facie case of discrimination—to hold that these reasons are pretextual, the court is *extremely* skeptical that Nixon's firing was not based, at least in part, on the termination of her relationship with Kysela.

[13] The court reiterates that Nixon has failed to create a genuine dispute of material fact that Kysela subjected her to unwelcome sexual advances after the end of their consensual relationship.  To the extent this element requires that "[t]he harassment complained of [be] based upon sex[,]" it necessarily fails in the absence of any unwelcome sexual advances.  *See Okoli*, 648 F.3d at 222.

case of quid pro quo sexual harassment.  Accordingly, the court must grant Defendants'
motion for summary judgment on this claim.

### B.  Breach of Contract

Nixon also brings a claim against the Company for breach of contract, alleging that her
termination on September 29, 2019, violated the terms of her employment agreement.  To
succeed on a breach of contract claim, under Virginia law, Nixon must show: (1) a legally
enforceable contract between the parties; (2) the defendant's violation or breach of the
contract; and (3) an injury or harm to the plaintiff caused by the defendant's breach.  *See Navar,
Inc. v. Fed. Bus. Council*, 748 S.E.2d 296, 299 (Va. 2016).  "When contract terms are clear and
unambiguous, a court must accord those terms their plain meaning."  *Quadros & Assocs., P.C.
v. City of Hampton*, 597 S.E.2d 90, 93 (Va. 2004) (internal quotation marks omitted).  Nixon
signed a written employment contract with the Company on July 31, 2019, and neither party
contests the enforceability of that agreement.  Rather, the Company asserts that it did not
breach the employment agreement because Nixon was fired in accordance with its terms.  The
court agrees.

The employment agreement provided that Nixon would be employed for a three-year
term from August 19, 2019, through August 18, 2022.  The Company could terminate Nixon's
employment early in four scenarios:

> a.  Conduct by Nixon evidencing substance or alcohol abuse or
>     dependency, disloyalty, dishonesty or any other conduct in
>     contravention of the financial and business interests of [the
>     Company]; or
>
> b.  Nixon's failure to generate and attain minimum monthly sales
>     of $70,000.00 per month by May 19th, 2020, which is nine (9)
>     months from the beginning of this Agreement; or

      c.   Nixon's breach of the terms and provisions hereof; or

      **d.   [The Company's] dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided [the Company] gives Nixon a 30-day written notice.**

(ECF No. 55-1, at 63 (emphasis added).)  These termination provisions—and particularly the fourth scenario—gave the Company broad discretion to fire Nixon if her work was not satisfactory.  In the fourth scenario, Kysela had sole authority to determine whether Nixon's work performance was satisfactory.  He exercised that discretion and determined that Nixon's performance could not sustain her employment.

      Like Nixon's arguments on the quid pro quo sexual harassment claim, Nixon contends that Kysela was not actually dissatisfied with her work performance.  She asserts that Kysela is using scenario four as a pretextual reason for firing her, and that he actually fired her because he was unhappy that their personal relationship ended.  The fact of the matter is both positions can be true; Kysela could have been unhappy that his personal relationship with Nixon had ended *and* dissatisfied with her work performance.  In other words, the record indicates that Kysela overlooked Nixon's poor work performance over her years of employment and chose *not* to exercise his discretion and fire her on that basis, because of their personal relationship.  Relative to the Company's other sales representatives Nixon had extremely low sales numbers.  Across all the years that she worked for the Company, she only met her monthly sales goal on one occasion.  Two key employees of the Company testified that they were not in favor of rehiring Nixon in the first place because she was "not a wine salesperson" and "was in the

bottom quarter" of salespeople at the Company.  (Dep. of Leslie Gimble at 25:12–15, 26:7–16; Dep. of Jennifer Russell at 26:10–27:6.)

That Kysela also had a personal reason for ending Nixon's employment does not automatically foreclose the possibility that he was dissatisfied with her work performance. Ultimately, the termination provisions of Nixon's employment agreement gave Kysela the sole discretion to determine if Nixon's work was satisfactory.

Nixon also argues that the Company did not adhere to the employment agreement's term requiring it to provide Nixon with a 30-day written notice prior to the premature termination of her employment.  The undisputed facts show that, on September 29, 2019, Kysela informed Nixon that she would be fired.  On October 1, Kysela sent an e-mail to Nixon confirming the termination of her employment and stating: "We will need to discuss your last day and transition out of the company . . ."  (ECF No. 52-1, at 214.)  Nixon's final day at the Company was October 31.  In Nixon's view the notice given to her was inadequate for three reasons: (1) it did not specify which termination scenario the Company was invoking and why; (2) it did not clearly state that Nixon had 30 days before her termination would be effective; and (3) she was not given a 30-day cure period through which Nixon could improve her work performance and retain her employment.  None of these arguments is persuasive.

Nixon asks the court to read requirements into the employment agreement that the parties did not agree to. But "[w]hat the parties claim they might have said, or should have said, cannot alter what they actually said." *Babcock & Wilcox Co. v. Areva NP, Inc.* 788 S.E.2d 237, 249–50 (Va. 2016). The termination provision of Nixon's employment contract does not require the Company to clearly state in writing that basis for her termination or the fact that

she will have 30 days before her termination takes effect. The fourth scenario is the only one that requires any type of written notice. The Company was only required to give Nixon 30 days written notice, which it did. Nixon argues that "[t]he logical meaning for the thirty-day notice" in the fourth scenario is "that it created a cure period" that should have allowed Nixon a chance to improve her work performance and retain her employment. (Pl.'s Opp'n. at 22.) The contract contains no mention of a cure period, and the court will not read this term into the parties' agreement, which is clear and unambiguous. *See Babcock*, 788 S.E.2d at 249–50; *Quadros*, 597 S.E.2d at 93.

It is not the court's place to determine whether Nixon was given "ideal" notice or whether her firing comports with best business practices. Instead—particularly where the parties actually negotiated on the terms of an employment agreement (*see* ECF No. 52-1, at 127)—the court accepts the agreed-upon terms and gives them their plain meaning. Accordingly, the court finds that the Company terminated Nixon's employment properly under their contract and will therefore grant the Company's motion for summary judgment on that claim.

## C. Gross Negligence

Nixon brings her claim for gross negligence against Kysela based on damages she sustained from taking Kysela's Clonazepam, a Schedule IV controlled substance. Kysela's doctor prescribed him Clonazepam as a sleeping aid. During the course of their romantic relationship, Nixon requested that Kysela share his Clonazepam with her because she was having difficulty sleeping. (Nixon Dep. at 312:22–313:2.) Nixon took the medication without knowing what it was called or conducting any research on possible effects. Moreover, Nixon

knew that the Clonazepam was prescribed to Kysela and that taking medication that had been prescribed to someone else was illegal.[14]  Nixon eventually became addicted to the medication. Three years after Nixon began taking Kysela's Clonazepam prescription, she asked her doctor to prescribe the medication to her.  Her doctor refused and advised Nixon to stop taking the medication.  Nonetheless, Nixon continued taking the drug for two more years.  After Nixon ended the relationship with Kysela, she required therapy to discontinue her use of the Clonazepam. Because the court finds that Nixon was contributorily negligent, it will grant Kysela's motion for summary judgment on this claim.

"The essential elements of a negligence claim in Virginia, as elsewhere, are (1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." *Talley v. Danek Med., Inc.*, 179 F.3d 154, 157 (4th Cir. 1999).  "The Virginia Supreme Court has established that negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation or doing what such person would not have done under existing circumstances." *Souleyrette v. Conaway*, 8 F. Supp. 2d 554, 558 (W.D. Va. 1998) (internal quotation marks omitted) (quoting *Moore v. Va. Transit Co.*, 50 S.E.2d 268, 271 (Va. 1948)).  In Virginia, "[g]ross negligence is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (internal quotation marks omitted).

---

[14] Under Virginia law, "[i]t is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice . . . ." Va. Code. Ann. § 18.2-250.

As an initial matter, Kysela argues that he did not owe a duty to Nixon and therefore could not have breached that duty. But Virginia recognizes a "broad duty not to injure others by acts of omission or commission." *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 810 (Va. 2018). This broad duty is implicated here, where Kysela voluntarily gave Nixon his prescription medicine knowing that she had not consulted a physician or conducted any research into the side effects of the drug. Even still, the standard for *gross* negligence in Virginia is quite high; a defendant who exercises "some degree of care" can defeat a gross negligence claim under Virginia law. *Elliot*, 791 S.E.2d at 732. But the record in this case is devoid of any evidence that Kysela took any action whatsoever to avoid or advise Nixon of the harm involved in taking his prescription medication. Without this evidence, the court cannot conclude as a matter of law that Kysela did not act with gross negligence when he gave Nixon his Clonazepam.

That does not end the inquiry, however, because in Virginia, contributory negligence is a complete defense to allegations of negligence.[15] *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 405 n.6 (4th Cir. 2011). "Contributory negligence is a defense that is based on the objective standard of whether a plaintiff failed to act as a reasonable person would have acted for [her] own safety under the circumstances." *Ponirakis v. Choi*, 546 S.E.2d 707, 710

---

[15] Kysela argues interchangeably that Nixon was either contributorily negligent as a matter of law or assumed the risk. Virginia courts have stated that "the doctrine of assumption of risk must be distinguished from th[at] of contributory negligence." *Monk v. Hess*, 191 S.E.2d 229, 245 (Va. 1972). Assumption of the risk requires that a plaintiff fully appreciate the nature and extent of the risk but voluntarily incur it anyway. *See id.* "Carelessness is the essence of contributory negligence while venturousness is the chief characteristic of assumption of risk." *Id.* Nixon's actions are much more akin to recklessness than venturousness. She took the Clonazepam without first asking for the name of the drug or researching any of its side effects. Because she lacked this knowledge, she could not have fully appreciated the nature and extent of the risk she was undertaking.

(Va. 2001).  "The essence of contributory negligence is carelessness."  *See id.* at 711.  Although contributory negligence is typically an issue for the jury, courts can resolve it when there is no genuine dispute as to any material fact.  *See Turner v. Walmart Stores E., LP*, No. 4:20cv41, 2021 WL 1783256, at *6 (W.D. Va. May 5, 2021) (collecting cases).

The court finds that no reasonable juror could conclude that Nixon failed to act as a reasonable person would have acted for her own safety by ingesting medicine without knowing what it was, what it did, or consulting a physician.  Nixon knew at the time that taking drugs that were prescribed to another individual constituted a crime under Virginia law.  Nixon's continued use of the drug after being denied her own prescription and being instructed by her physician to stop taking the drug bolsters this conclusion.  Nixon's failure to act prudently as it regards her own safety in taking a controlled substance without a physician's advice acts as a complete bar to recovery for her negligence claim and the court will grant Kysela's motion for summary judgment accordingly.

## IV.    CONCLUSION

For the above reasons the court will grant Defendants' motion for summary judgment with respect to Nixon's remaining claims for Title VII quid pro quo sexual harassment, breach of contract, and gross negligence.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 17th day of March, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE